[Crim. No. 27495. Second Dist., Div. Two. Apr. 27, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIO BURGUNO CASTANEDA, Defendant and Appellant.

## COUNSEL

Jeffrey Adrian Villagran, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Marc E. Turchin, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FLEMING, Acting P. J.**—In consolidated cases Mario Burguno Castaneda appeals the judgment and "every intermediate order made therein" after a jury trial convicting him of possession of cocaine (Health & Saf. Code, § 11350), possession of cocaine for sale (Health & Saf. Code, § 11351), and possession of heroin for sale (two counts; Health & Saf. Code, § 11351).[1]

---

[1]The jury acquitted appellant's codefendant, his wife Elia Moreno Castaneda, on a charge of possession of heroin.

Viewed in a light most favorable to the judgment (*People* v. *Lawler,* 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]), the evidence shows the following:

At 2 a.m. on 2 July 1974 Inglewood Police Officers Aguilar, Reeves, and others executed a warrant to search the residence of appellant Mario Castaneda at 224 East 64th Place in Inglewood. Aguilar went to the front door, Reeves to the rear door. A dog on the front porch barked and yelped as Aguilar knocked on the front door and shouted, "Police officers. We have a search warrant. Open the door." Aguilar continued banging on the door for three to five minutes. He heard a thumping sound, as of a foot on a carpeted floor, but no one answered his knock. Aguilar then forced in the front door.

Reeves heard the front door being forcibly entered, and he forced in the rear door. He and other officers went up the stairs, through an open doorway into the bedroom where appellant and his wife were in bed. Aguilar served the warrant, and the officers searched the house. On a shelf in the bedroom closet they found 141 balloons divided up in 5 larger balloons. The balloons contained powder, 8.5 percent heroin. In the closet the officers also found bottles of lactose. In the freezer compartment of the kitchen refrigerator they found $12,000 in cash.

On the evening of 8 December 1974 Aguilar obtained a warrant to arrest appellant's wife. From the Inglewood station, Aguilar telephoned appellant's house. When appellant's wife answered the telephone, Aguilar told her he had a warrant for her arrest and asked her to wait there for him. She said she would wait.

Aguilar started to drive to appellant's house, but in the meantime Inglewood Officer Guerrero saw appellant and his wife driving away. Guerrero pulled their car to the curb, intending to arrest appellant's wife and detain appellant for questioning. Appellant got out of the car and asked Guerrero what was going on. When Aguilar arrived at the scene, appellant approached him and asked what was happening.

Appellant told Aguilar he was no longer dealing in narcotics, that he wanted to help in narcotics investigations by making buys and helping with busts. Aguilar said he would have to be sure defendant no longer was dealing in narcotics. Aguilar advised appellant of his constitutional rights. Aguilar described the following conversation:

"I asked him if he would mind if I searched the vehicle that he was in and he said, 'Go ahead.' And I said, 'How about your house?' He said, 'I have no drugs. There is nothing there.' And I asked him about the bar. He said everything—he hasn't had any drugs in a long time and that he was completely clean and that if we could hurry up, he would help me arrest someone else. I asked him if he would consent to the search of his vehicle again and the search of his residence and the search of his business. He stated he would. I asked him if he was sure and he stated he was sure. He says, 'There's nothing there. I have nothing to hide.' I told him that there was no need for him to give consent if he didn't want to. He said, 'I have nothing to hide there. I'm clean.' I think those were the words he used, 'I'm clean. I haven't had any dealings with any drugs,' or something to that effect. I then requested him—requested to know if he would sign a consent form. He stated he would. I said, 'Are you sure?'

" 'Yes, I'll sign it.' I and Agent Guerrero prepared a handwritten form indicating his consent and he signed it. Then he requested that Mrs. Castaneda sign it."

The consent form was in English and Spanish: "I Mario Castaneda have been advised of my constitutional rights by Officer Aguilar. I further have given the Inglewood Police Officers (Aguilar, Kriha, Guerrero, Reeves and Sergeant Shovlin) permission to search my residence, 224 64th Pl.; my car lic. number 873 LIC and my bar, known as Elia's Club located at 1328 No. La Brea, Inglewood. I have read this statement and sign it freely and voluntarily."

The officers then searched appellant's house and found a plastic bag containing cocaine behind the bedroom dresser. Aguilar arrested appellant and took him to his business, a bar, reminded him of his constitutional rights, and again obtained his consent to search the bar. Beside a jukebox the officers found plastic baggies containing 142 grams of powder, 25 percent heroin, and 37 grams of cocaine. Behind a panel in the ceiling the officers found a brown paper bag containing two paper towels and a kitchen measuring spoon.

At the police station, appellant asked Officer Guerrero if his wife would be charged on the narcotics found at the bar. Guerrero said yes, because the bar belonged to both of them. Appellant said, "I swear to God . . . the drugs that you found in the bar and in the house belong to me and Elia had no idea that they were there."

Based on the quantity, quality, manner of packaging, and the fact that appellant and his wife were not narcotic users, Officer Aguilar opined that appellant possessed for purposes of sale the heroin found in the bedroom closet and the cocaine and heroin found in the jukebox.

Appellant contends the trial court should have suppressed evidence resulting from searches of his house and business because, (1) on 2 July 1974 the police violated Penal Code section 1531 on entering his bedroom, and (2) on 8 December 1974 his first consent to search his house and bar was involuntary and the second consent to search the bar was invalidated by the failure of the police to readvise him of his constitutional rights.

1. *Knock and Notice.* ■ Penal Code section 1531 provides that an officer may break open any outer or inner door of a house to execute a search warrant if, after notice of his authority and purpose, he is refused admittance. These requirements apply to entries of closed outer and inner doors (*People* v. *Gastelo,* 67 Cal.2d 586 [63 Cal.Rptr. 10, 432 P.2d 706]; *People* v. *Webb,* 36 Cal.App.3d 460, 465 [111 Cal.Rptr. 524]) and to open outer doors (*People* v. *Bradley,* 1 Cal.3d 80, 87 [81 Cal.Rptr. 457, 460 P.2d 129]). ■ Appellant contends the same requirements should apply to the entry of open inner doors, and thus the officers' entry of his open bedroom door on the morning of 2 July 1974 was illegal.

*People* v. *Livermore,* 30 Cal.App.3d 1073 [106 Cal.Rptr. 822], holds that, absent special circumstances, the requirements of section 1531 are directed to the initial entry of a structure: "[T]he officers fully complied with Penal Code section 1531 at the time of their entry into the house. Their subsequent non-violent entry of an occupied bedroom through an open door was not a 'breaking' which required a repetition of the notice." (30 Cal.App.3d at 1077.) The same reasoning applies to the case at bench.

Appellant argues *Livermore* is wrong, that the purpose of section 1531 is to minimize the consequences of an unannounced intrusion (see *People* v. *Bradley, supra*), and that an unannounced intrusion into a bedroom could lead to unnecessary and violent confrontation. We see no reason, however, to depart from *Livermore* in the circumstances of this case. Officer Aguilar knocked and identified himself and his mission several times for several minutes at the front door of appellant's house. Even officers at the rear of the house could hear what Aguilar was doing. Aguilar heard what could have been footsteps inside, but no one

responded to his call or to the commotion created by the barking dog on the front porch. It was reasonable to conclude either no one was inside the house, or, if someone were inside, he knew who was pounding on the front door and why. It would be absurd in these circumstances to require knock and notice at every open threshold throughout the house.

2. *Consent.* ▉ Appellant contends his consent to search the house and bar was involuntary. He points out that he had been detained by armed officers, his wife was under arrest, and Officer Aguilar was demanding the right to search his house and business as well as his car.

The contention is without merit. It was for the trial court to resolve conflicts in the evidence, and substantial evidence supports the trial court's finding that the consent was voluntary. (*People v. Bilderbach,* 62 Cal.2d 757, 762-763 [44 Cal.Rptr. 313, 401 P.2d 921].) According to Aguilar's testimony, appellant suggested the initial search and willingly agreed to further searches suggested by Aguilar. Appellant's unsupported hopes or fears as to the effect of his cooperation with the police do not render his otherwise voluntary statements invalid. (*People v. Gonsalves,* 275 Cal.App.2d 724, 729 [80 Cal.Rptr. 340].)

▉ Appellant also contends that after contraband was discovered at his house the police should have readvised him of his constitutional rights before obtaining renewed consent to search his bar.

Neither the law nor the facts support this contention. The police are not required to advise an accused of his constitutional rights prior to obtaining a consent to search. (*People v. Thomas,* 12 Cal.App.3d 1102, 1107-1112 [91 Cal.Rptr. 867].) And Officer Aguilar testified he reminded appellant of his constitutional rights after the discovery of contraband at appellant's house and prior to obtaining his renewed consent to search the bar.

Appellant has filed a lengthy appeal brief on his own behalf in which he contends that the police harassed him and conspired against him, forced his wife to inform against him, searched his house in the night-time without authorization, used perjured testimony and doctored evidence against him, that he speaks little English and should have been provided with a Spanish interpreter, and that he is the victim of social injustice. These contentions are premised on allegations of facts outside the record on appeal, however, and cannot be considered here. (*People v. Almengor,* 268 Cal.App.2d 614, 617 [74 Cal.Rptr. 213].) The original copy

of the search warrant contains authorization for a nighttime search, and counsel stipulated in the trial court that the police were authorized to conduct a nighttime search. (*People* v. *Tedesco,* 1 Cal.2d 211, 220-221 [34 P.2d 467].) It cannot be presumed appellant's trial counsel was unfaithful to the best interests of appellant in his conduct of the defense. (*People* v. *Amado,* 167 Cal.App.2d 345, 347 [344 P.2d 254].)

The purported appeals from intermediate orders are dismissed. The judgment is affirmed.

Compton, J., and Beach, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 24, 1976.